Robert Drazkowski PLUTSHACK, by his natural parent and natural guardian, Christine Drazkowski Plutshack and Christine Drazkowski Plutshack, individually, Appellants,

v.

The UNIVERSITY OF MINNESOTA HOSPITALS, et al., Respondents,

Dr. William Woods, Respondent,

Dr. Kenneth Swaiman, Respondent.

No. 51087.

Supreme Court of Minnesota.

Feb. 12, 1982.

Paul Tierney and Peter Krieser, Minneapolis, for appellants.

Geraghty, O'Loughlin & Kenney and James Kenney, St. Paul, for the U. of Mn. Hospitals, et al.

Meagher, Geer, Markham, Anderson, Adamson, Flaskamp & Brennan and Mary Jeanne Coyne, Minneapolis, for Dr. Woods.

Bassford, Heckt, Lockhart & Mullin and Greer Lockhart and John Anderson, Minneapolis, for Dr. Swaiman.

PETERSON, Justice.

Plaintiffs Robert Plutshack, a minor, and Christine Plutshack, his mother, brought this medical malpractice action against defendants Kenneth Swaiman, M.D., William Woods, M.D., Deborah Oleson, R.N., and the University of Minnesota Hospitals. Plaintiffs sought damages upon the allegations that defendants negligently cared for Robert Plutshack and performed certain lumbar punctures upon him without Christine Plutshack's actual or informed consent. At the close of plaintiffs' case the trial court directed a verdict for each defendant. Plaintiffs appeal from the order directing verdicts and from a subsequent order denying their motion for a new trial. We affirm.

Plaintiff Robert Plutshack (Robert) was born on November 11, 1974, with achondroplasia, a condition causing dwarfism, and hydrocephalus, an enlargement of the head due to the accumulation of fluid in the brain. On April 14, 1975, at the age of 5 months, Robert was admitted to defendant University of Minnesota Hospitals (the hospital) for evaluation. His attending physician was defendant Kenneth Swaiman, M.D., the head of the Department of Pediatric Neurology at University of Minnesota's medical school.

A CAT scan, a computer-assisted series of X-rays, was performed on Robert's brain on April 22, 1975. The CAT scan disclosed an abnormal enlargement of the brain ventricles,[1] a condition consistent with hydrocephalus. The CAT scan also indicated an unusual malformation in the posterior portion of the left ventricle which the radiologist termed a porencephalic cyst dilation. Such a malformation is not commonly associated with hydrocephalus.

A pneumoencephalogram (PEG) was then ordered for Robert to determine (1) whether there was an obstruction arresting the normal flow of spinal fluid between the spinal cord and the ventricles of Robert's brain and (2) whether there were additional areas of malformation in the posterior portion of his brain.

A PEG is an X-ray of the brain. The procedure involves the introduction of air into the subarachnoid space[2] by means of a lumbar puncture (a spinal tap). The air flows up into the ventricles of the brain, outlining and defining them so that abnormalities are readily observable when the brain is X-rayed. In almost all cases, some morbidity attends a PEG. Possible side ef-

fects include restlessness, irritability, sweating, nausea, vomiting, diarrhea, fever and collapse. The lumbar puncture itself may cause hemorrhage, infection or impaling of the spinal cord and may alter the pressure relationships in the spinal fluid system.

Robert's mother, plaintiff Christine Plutshack, consented to performance of the PEG. Dr. Leutscher, a neurology resident, attempted to perform a PEG on Robert on April 29 but halted the procedure when he was unable to obtain a flow of spinal fluid sufficient to permit the introduction of air. Robert was discharged upon the recommendation that he be readmitted in two weeks for another attempt at a PEG.

Robert returned to the hospital on May 13. The medical history taken upon his admission indicates that he had recently recovered from a cold. Dr. Leutscher attempted a PEG the following day. Robert's rectal temperature, taken just before the procedure, was 100.4 degrees.[3] Dr. John Latimer, a resident in pediatrics who was treating Robert, attributed Robert's elevated temperature to preoperative medication and the fact that the room was warm. Again, the PEG was unsuccessful because Dr. Leutscher was unable to obtain a steady flow of spinal fluid.

By 2 p. m. on the next day, May 15, Robert's rectal temperature had increased to 102.4 degrees. Because of his fever Robert was not discharged from the hospital. Robert's temperature remained at approximately 100 degrees through May 16 but increased to 103.2 degrees by the evening of May 17. Robert had an episode of vomiting and showed signs of ear infection and a stiff neck. These symptoms suggested meningitis.[4] A lumbar puncture was or-

---

1. The ventricles of the brain are the several cavities or chambers occurring normally in the brain. 3 Schmidt, *Attorney's Dictionary of Medicine* V–48 (1979).

2. The subarachnoid space is the space between the arachnoid and the pia mater. The pia mater is the innermost of the three membranes, or meninges, which encase the brain and the spinal cord. The arachnoid is the middle layer. The space between these two membranes is

filled with cerebrospinal fluid. 3 Schmidt, *supra* n.1, at S–170.

3. A rectal temperature is approximately 1 degree higher than an oral temperature. A normal rectal temperature is approximately 99.6 degrees.

4. Meningitis is an inflammation of any or all of the meninges, the three membranes surrounding the brain and spinal cord. Meningitis usually begins with soreness of the throat, fever,

dered to obtain a sample of Robert's spinal fluid for testing to determine whether he had indeed contracted the disease.[5]

At approximately 12 a. m. on May 18 a nurse telephoned Christine Plutshack's mother, Mrs. Bernard Drazkowski, to ask for consent to the lumbar puncture.[6] Mrs. Drazkowski was unable to locate her daughter. Mrs. Drazkowski told the nurse that she would give her own consent to the lumbar puncture.

Dr. Shaw, a resident, performed the lumbar puncture at 2 a. m. In his report Dr. Shaw described the lumbar puncture as "difficult." He attributed the elevated serum glucose that was demonstrated by a subsequent test of Robert's blood to a stress response to the lumbar puncture. Additionally, the lumbar puncture was "traumatic": the needle struck a blood vessel in the meninges surrounding the spinal cord with the result that blood was included in the sample of Robert's spinal fluid. Analysis of the spinal fluid showed the presence of white blood cells. White blood cells are not usually found in spinal fluid; when present, they may indicate meningitis. In the sample of Robert's spinal fluid, however, the number of white blood cells was not disproportionate to the number of red blood cells. It was impossible to determine whether the white blood cells in Robert's spinal fluid confirmed that he had meningitis or were present merely because the lumbar puncture had been traumatic.

Robert's symptoms persisted throughout the day of May 18. That evening Dr. Latimer consulted with Dr. Swaiman by telephone as to the proper course of action. Dr. Swaiman advised Dr. Latimer to perform another lumbar puncture in order to obtain spinal fluid for further analysis. Dr. Latimer testified that after his conversation with Dr. Swaiman he spoke with Christine Plutshack and obtained her consent to another lumbar puncture. Although Christine Plutshack testified that her conversation with Dr. Latimer had taken place during the morning of May 18, she agreed that she gave him permission to perform another lumbar puncture. Dr. Latimer performed the lumbar puncture at 11 p. m. but was unsuccessful in obtaining a sample of Robert's spinal fluid. He made three or four passes with the needle but ceased the procedure in order to give Robert a rest when Robert became flushed and agitated. Another lumbar puncture was scheduled for the following day, May 19.

Robert's temperature remained elevated overnight. At 8:30 a. m. on May 19 defendant William Woods, M.D., the chief pediatrics resident, performed a lumbar puncture upon Robert. Defendant Deborah Oleson, R.N., assisted Dr. Woods; Robert Hunter, a medical student, observed the procedure. Ms. Oleson draped all of Robert's body except his back and held him on his side in a flexed position. Dr. Woods made three punctures; upon the third he was successful in obtaining a flow of spinal fluid. Collection of the spinal fluid took 3–4 minutes. Robert was irritable and cried until halfway through collection of the spinal fluid; at that point he became still. Dr. Woods asked Ms. Oleson if Robert was "okay." Ms. Oleson checked Robert and observed that his chest was moving and his color was pink. Robert reacted when Hunter stimulated his foot. After collection of the spinal fluid was completed, Dr. Woods looked at Robert and made sure that he was breathing. Then Dr. Woods left the room and took the spinal fluid sample to a secretary's desk about 15 feet away.

lassitude, a general aching of the body, rapid pulse and chills. The patient may also develop a stiff neck. Unconsciousness, delirium, and convulsions may follow in severe cases. A significant mortality rate is associated with the disease.

5. Infection with any one of a number of bacteria or viruses may cause meningitis. Treatment of the disease depends on the specific organism involved. A culture of the patient's spinal fluid is necessary to identify the organism. The preferred method of obtaining spinal fluid for a culture is a lumbar puncture.

6. Christine Plutshack had no telephone at her residence and had given the hospital her mother's telephone number as the number at which she could be reached.

After Dr. Woods had left the room and about 30 seconds after the procedure had ended, Ms. Oleson removed the drape from Robert and turned the child over onto his back. As Robert was placed in a flat position, his color changed and he became limp. Hunter immediately placed his stethescope on Robert's chest and listened for a heartbeat or the sound of breathing. He heard neither. Hunter called for Dr. Woods; they immediately started cardiopulmonary resuscitation. Robert's heart began to beat spontaneously 2–3 minutes later. Dr. Latimer, who was not present when these events took place, noted in Robert's chart that Robert had experienced "cardiac arrest—probable mechanical injury secondary to positioning for lumbar puncture."

Robert suffered permanent injuries and is now in a semicomatose state. In July 1976 Christine Plutshack, on behalf of Robert and for herself individually, commenced this action against Dr. Swaiman, Dr. Woods, Ms. Oleson and the hospital. She sought compensation from defendants for Robert's personal injuries and the medical expenses she had incurred and would incur on his behalf. She alleged (1) that Robert's injuries were the result of negligent care and treatment on the part of Dr. Swaiman, Dr. Woods and Ms. Oleson and (2) that several of the lumbar punctures performed on Robert had been done without her actual or informed consent. She sought recovery from the hospital on the basis of the doctrine of respondeat superior.

The matter was tried before a jury in November 1979. Plaintiffs introduced into evidence the videotaped deposition of Dr. Bernard Glass, a specialist in neurosurgery and neurology who practices medicine in California, in an attempt to demonstrate defendants' negligent care and treatment of Robert. After plaintiffs rested their case, the trial court directed a verdict for each defendant. Plaintiffs now appeal.

The issue raised by this appeal is whether the trial court was correct in directing a verdict for each defendant on plaintiffs' claims of negligent care and treatment and failure to obtain actual and informed consent. A motion for directed verdict presents a question of law regarding the sufficiency of the evidence to create a fact question for the jury's decision. For purposes of the motion, the trial court must consider the record in its entirety and treat as credible the evidence for the adverse party and all inferences that may reasonably be drawn from that evidence. Not every conflict in the evidence, however, gives rise to a jury question. The trial court should direct a verdict for the party in whose favor the evidence is overwhelmingly predominant even if there is some evidence for the adverse party. *Zinnel v. Berghuis Construction Co.*, 274 N.W.2d 495, 498 (Minn.1979). The same standard governs this court on appeal.

To establish a prima facie case of negligent care and treatment against each of the individual defendants, Dr. Swaiman, Dr. Woods and Ms. Oleson, plaintiffs were required to introduce expert testimony demonstrating (1) the standard of care recognized by the medical community as applicable to the particular defendant's conduct, (2) that the defendant in fact departed from that standard, and (3) that the defendant's departure from the standard was a direct cause of Robert's injuries. *Smith v. Knowles*, 281 N.W.2d 653, 655 (Minn.1979).[7] The trial court directed verdicts for Dr. Swaiman, Dr. Woods and Ms. Oleson on the ground that plaintiffs had failed to demonstrate a departure from the applicable standard of care. Since the hospital's liability to plaintiffs was claimed on the basis of the doctrine of respondeat superior, the trial court also directed a verdict for the hospital.

Defendants do not dispute that the injuries for which plaintiffs now seek compensation were caused by the cardiac arrest

---

7. The standard of care recognized by the medical community has been defined as the "standard of skill and learning ordinarily possessed and exercised under similar circumstances by physicians in good standing in the same or similar localities." *Swanson v. Chatterton*, 281 Minn. 129, 134, 160 N.W.2d 662, 666 (1968) (footnote omitted).

Robert suffered on May 19, 1975. Plaintiffs' expert witness, Dr. Bernard Glass, testified that in his opinion Robert's cardiac arrest occurred as a result of the noxious stimuli of the lumbar punctures performed on him during the period April 29–May 19, 1975. The history of those lumbar punctures may be summarized as follows:

| Date | Performed By | No. of Insertions of Needle |
|------|--------------|------------------------------|
| 4/29/75 | Dr. Leutscher | 2 |
| 5/14/75 | Dr. Leutscher | 1 |
| 5/18/75 (2AM) | Dr. Shaw | 1 |
| 5/18/75 (11PM) | Dr. Latimer | 3 or 4 |
| 5/19/75 (9AM) | Defendant Woods | 3 |

■ 1. Plaintiffs' claim that Dr. Swaiman, Robert's attending physician, was negligent in his care and treatment of Robert, and that the hospital is vicariously liable for Dr. Swaiman's negligence, is based upon the allegation that Dr. Swaiman allowed a greater number of lumbar punctures to be performed on Robert than the medical community considers appropriate. Specifically, plaintiffs allege (1) that the PEGs Dr. Swaiman ordered for Robert and, therefore, the lumbar punctures incidental to the PEGs were not medically necessary and (2) that Dr. Swaiman permitted too many needle insertions to be made in the course of the second and third attempts to obtain a sample of Robert's spinal fluid for testing to determine whether he had meningitis.

When Robert was admitted to the hospital on April 14, 1975, he was achondroplastic and hydrocephalic. He also had poor head control and suffered from weakness and coordination problems. The CAT scan conducted on April 22, 1975, showed several abnormalities. However, it was not possible to determine from this test whether these abnormalities were the result of an atrophic process or obstructive hydrocephalus. It is undisputed that obstructive or progressive hydrocephalus requires treatment and that a PEG would tell whether Robert was suffering from obstructive hydrocephalus.

The hospital staff attempted five procedures requiring lumbar punctures, the first two for the purposes of performing a PEG and the last three in an effort to obtain spinal fluid to analyze for possible meningitis. Dr. Glass himself testified that a spinal tap is indicated if there is any question of meningitis and that he would have been critical if Robert's doctors had decided not to perform the tap during which Robert suffered cardiac arrest.

Dr. Glass also testified that he recognizes Professor Waldo E. Nelson as an authority in pediatrics. He read from the stand the following statement from Nelson's *Textbook of Pediatrics*: "If meningitis is suggested * * *, good judgment requires that too many rather than too few lumbar punctures be done. * * * [I]f one obtains no normal cerebral spinal fluid examination among diagnostic lumbar punctures, too few are being done." Since defendants were testing for meningitis in the last three of the five tapping procedures, plaintiffs have not established that, in performing these tests, defendants violated any standard of care.

The first two procedures, those on April 29 and May 14, were not done in order to diagnose meningitis. They were attempts to perform a PEG, which would tell the doctors whether there were obstructions arresting the flow of spinal fluid between the spinal chord and the ventricles of Robert's brain. Dr. Swaiman was the physician in charge of Robert's care during his second hospital admission. He was responsible for the decision to perform all lumbar punctures except those associated with the first attempt to complete a PEG.

At several points in his deposition, Dr. Glass was questioned as to the standard of care regarding the decision to administer the PEG. Although he indicated that it is unacceptable medical practice to perform a PEG in order to determine whether hydrocephalus might become progressive in the future, his testimony became considerably less certain as more questions were asked. Dr. Glass admitted that a CAT scan was performed on Robert before the PEG was ordered, that the scan indicated an abnormality in the left lateral ventricle of Rob-

ert's brain and that the suspected abnormality was one not normally associated with hydrocephalus. He further agreed that the reader of the scan could not tell whether there was an obstruction in the passageway from the ventricle to the interior portion of the brain and that a PEG would disclose such an obstruction.

Dr. Glass then testified that he would not have done a PEG and that a PEG would not be the procedure of choice at this point. However, he also admitted that the opinions he had given would vary from those of other well-recognized experts in the field. These statements of Dr. Glass regarding the procedure to be used under this specific set of circumstances do not establish a standard of care. Although Dr. Glass testified that he would not have done the PEG in this case, he did not testify that Dr. Swaiman did not follow acceptable medical practice.

Even more serious, however, is plaintiffs' failure to show that any act or omission on defendants' part was the proximate cause of Robert's injury. Dr. Glass testified that the cardiac arrest was a result of the cumulative effect of the large number of lumbar punctures which were attempted on Robert. If that is true, it is impossible to find negligence, because the plain fact is that the final three punctures—those which produced a "cumulative effect"—are also those which were medically necessary and prudent.

Dr. Glass seems to be saying that each tap weakened Robert's condition and ultimately caused the arrest. It was his testimony that "one of those taps was instrumental in creating the situation that led to his cardiac arrest." However, it is undisputed that a PEG was never completed on Robert. Because the doctors were unable to get an adequate flow of spinal fluid, they never injected air into the spinal column. Dr. Glass himself testified that Robert showed no adverse symptoms after either of the attempted PEGs. There was no indication of headache or nausea, no vomiting, and no collapse. Since Robert had no adverse reaction to the first attempted PEG,

there was no reason not to attempt another. Since there was no adverse reaction to either of the first two punctures, there is no evidence that either of them was a proximate cause of Robert's injury.

Plaintiffs also argue that Dr. Swaiman was negligent in his supervision of Robert's care. Dr. Glass testified that a careful physician would have intervened when the staff doctors were having trouble completing a spinal tap. However, there is substantial testimony to indicate, first, that Dr. Swaiman was continually aware of changes in Robert's status and, second, that the doctors performing the taps were well versed in the required procedure.

Dr. Swaiman personally saw Robert on May 14, 15 and 16. His associate, Dr. Lockman, saw Robert on May 17. Symptoms of meningitis appeared later that day, and a tap was attempted during the night. However, before performing the fourth tap (the second for meningitis), Dr. Latimer had an extensive phone consultation with Dr. Swaiman, who directed that further taps be done. The final two procedures were done by Dr. Latimer, who had previously performed about 50 lumbar punctures, and Dr. Woods, who testified that he had performed approximately 200 lumbar punctures on infants and children. We cannot find that Dr. Swaiman's supervision was negligent or that a different kind of supervision would have changed the result in this case.

■ In a medical malpractice case, plaintiffs have the burden of showing that "it was more probable that [injury] resulted from some negligence for which defendant was responsible than from something for which he was not responsible." *Silver v. Redleaf*, 292 Minn. 463, 465, 194 N.W.2d 271, 273 (1972) (footnotes omitted). Robert's injury was caused by cardiac arrest during the performance of a procedure which was medically necessary. While the result was tragic, there is no evidence to suggest that Dr. Swaiman was negligent in deciding to test for meningitis as he did. Furthermore, plaintiffs have shown neither that Dr. Swaiman's decision to perform the PEGs was contrary to acceptable medical

practice nor that his decision to perform the first two tests most probably caused Robert's injury.

Plaintiffs failed to establish a prima facie case of negligent care and treatment against the attending physician, Dr. Swaiman, and, vicariously, against the hospital. The trial court therefore did not err in directing a verdict for Dr. Swaiman and the hospital.

■ 2. Plaintiffs allege that Dr. Woods negligently performed the lumbar puncture of May 19—the one following which Robert's heart ceased functioning. Dr. Woods succeeded in obtaining a flow of spinal fluid upon his third attempt. As Dr. Woods was collecting the spinal fluid, Robert, who up to that point had been restless and difficult to control, suddenly quieted. In Dr. Glass' opinion, a reasonably prudent physician would immediately have stopped collection of fluid. Dr. Glass explained that Robert's cessation of activity was "the body's way of giving us an indication that something is happening; that there is an adverse reaction."

Although the testimony may be sufficient to demonstrate a standard of care applicable to Dr. Woods' conduct, and that Dr. Woods departed from that standard, the record contains no evidence sufficient to raise a jury question whether defendant Woods' negligence was a direct cause of Robert's injuries. Nowhere in his testimony did Dr. Glass express the opinion that it is more probable than not that if defendant Woods had ended the procedure when Robert ceased activity the cardiac arrest would not have occurred or Robert would have survived it without injury. Therefore, the trial court was correct in directing a verdict for Dr. Woods on plaintiffs' claim against him for negligent care and treatment.

■ Deborah Oleson, a registered nurse, assisted Dr. Woods as he performed the final lumbar puncture on Robert. She held Robert still, in a flexed position, with his head and his knees drawn together and his back curved outward in order to maximize the size of the spaces between his verte-brae. Plaintiffs claim that Ms. Oleson held Robert in such a way that he could not breathe and that this caused his cardiac arrest.

The only evidence regarding the standard of care applicable to Ms. Oleson's conduct is her own testimony. She testified that her nursing education had included the following instructions relating to the risk inherent in holding an infant for a lumbar puncture: "[I]f you're holding the patient on his side and flexing their knees up and trying to get their head down, you have to be careful not to obstruct their airway." This testimony may be sufficient to demonstrate the standard of care applicable to Ms. Oleson's conduct. Dr. Woods testified that Robert was breathing after the final lumbar puncture had been completed. The record therefore does not demonstrate that Ms. Oleson failed to comply with the applicable standard of care. Moreover, the record contains no expert testimony demonstrating that such conduct on the part of Ms. Oleson could have directly caused Robert's injuries. After the cardiac arrest, Dr. Latimer made the following note in Robert's chart: "cardiac arrest—probable mechanical injury secondary to positioning for lumbar puncture." At trial Dr. Latimer testified that he based this note on the assumption that Ms. Oleson had held Robert in a sitting position. The trial court correctly concluded that the note does not demonstrate causation because it was based on an inaccurate assumption. The trial court therefore did not err in directing a verdict for Ms. Oleson or plaintiff's claim against her for negligent care and treatment.

3. Plaintiffs' second claim against each defendant is based upon the allegations that the first lumbar puncture of May 18 was performed without Christine Plutshack's actual consent and that the second lumbar puncture of May 18, the lumbar puncture of May 19 and the lumbar punctures incidental to the PEG were performed without her informed consent.

■ Meningitis is a life-threatening disease. A spinal fluid culture is necessary to definitively diagnose meningitis; a lumbar

puncture is the preferred method of obtaining a spinal fluid sample. When Robert began to display symptoms of meningitis it became necessary to obtain a sample of his spinal fluid as quickly as possible. Hospital personnel attempted to reach Christine Plutshack at her mother's residence, but she could not be located. In such exigent circumstances, and considering the fact that Christine Plutshack's mother said the lumbar puncture could proceed, Christine Plutshack's actual consent to the first lumbar puncture of May 18 was unnecessary. Consent may be implied.

█ Christine Plutshack was informed that a PEG entailed a lumbar puncture. She twice consented to performance of a PEG on Robert. On May 18, after the first attempt to obtain a sample of Robert's spinal fluid for diagnostic purposes, she agreed to allow the procedure to be repeated. Plaintiffs allege Christine Plutshack's consent to these lumbar punctures was not informed because she was not told of all the risks associated with a lumbar puncture.

█ We first recognized a cause of action for negligent nondisclosure of a significant risk of treatment in *Cornfeldt v. Tongen*, 262 N.W.2d 684 (Minn.1977) (*Cornfeldt I*).[9] A plaintiff must demonstrate (1) a duty on the part of the physician to know of a risk or alternative treatment plan; (2) a duty to disclose the risk or alternative program, which may be established by a showing that a reasonable person in what the physician knows or should have known to be the plaintiff's position would likely attach significance to that risk or alternative in deciding whether to consent to treatment; (3) breach of that duty; (4) causation (the undisclosed risk must materialize in harm); and (5) damages. *Cornfeldt v. Tongen*, 295 N.W.2d 638, 640 (Minn.1980) (*Cornfeldt II*). The record in the present case establishes

that meningitis can be fatal if it is not properly diagnosed and treated, that a spinal fluid culture is the preferred method of diagnosis, and that a lumbar puncture is necessary to obtain a spinal fluid sample. The record contains no evidence indicating that the risk that materialized in harm in this case, the risk of cardiac arrest, is a significant risk when a lumbar puncture is performed on a child such as Robert. Therefore, the trial court correctly directed verdicts for defendants on the claim of negligent nondisclosure.

The trial court's order directing verdicts for all defendants is affirmed.

YETKA, Justice (concurring specially).

I concur in the decision only because I believe plaintiffs' counsel failed to prove a causal connection between the injury to the little boy and the alleged negligence of the doctor. I believe, however, that there is evidence of negligence based on the testimony of Dr. Glass alone. Considering the number of spinal punctures that Robert was given over the brief period of time, Dr. Glass indicated he would have expected the injury that ultimately resulted. Many of the attempts at treatment were unsuccessful. It is true, as Dr. Glass testified, that once meningitis is suspected, a spinal puncture is necessary to tap spinal fluid for verification. It is noteworthy, however, that meningitis was not found; therefore, there was strong evidence that the repeated initial and unsuccessful spinal taps caused a condition which resembled meningitis. If plaintiffs had expanded on this theory, they might have had sufficient evidence to create a fact question for the jury. The plaintiffs' case was based upon finding negligence in connection with the final spinal taps used in the attempt to diagnose meningitis. They failed because their own ex-

---

**9.** Defendants contend plaintiffs cannot sue for negligent nondisclosure because the lumbar punctures here in question were performed prior to our recognition of that cause of action in *Cornfeldt I*. We need not decide this question because the record does not establish that it was presented to the trial court. Moreover, we note, as we did in *Kinikin v. Heupel*, 305

N.W.2d 589, 594 (Minn.1981), quoting *Canterbury v. Spence*, 464 F.2d 772, 783 (D.C.Cir.), cert. denied, 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972): "[T]he evolution of the doctor's duty to communicate * * * 'has hardly involved an extraordinary restructuring of the law.' "

pert testified that those taps would have been necessary in that situation.

OTIS and KELLEY, JJ., took no part in the consideration or decision of this case.