Maude L. GOODRICH, Appellant,

v.

Malcolm A. McCANNEL, M.D., et al., Respondents.

No. C9-85-1277.

Court of Appeals of Minnesota.

Feb. 18, 1986.

Kenneth G. Schivone, Kenneth G. Schivone, P.A., St. Paul, Julian J. Zweber, St. Paul, for appellant.

Kevin P. Keenan, Jerome C. Briggs, Bassford, Heckt, Lockhart & Mullin, P.A., Minneapolis, for respondents.

Heard, considered and decided by WOZNIAK, P.J., and FORSBERG and NIERENGARTEN, JJ.

## OPINION

NIERENGARTEN, Judge.

This appeal is from an order directing a verdict for respondent and judgment entered April 19, 1985. The trial court determined that appellant failed to establish a causal connection between certain undisclosed risks encountered during cataract surgery and appellant's ultimate loss of vision. We affirm.

## FACTS

This medical malpractice case involves claims of negligent care and treatment by respondent Malcolm McCannel, M.D. and defendant Donald P. LeWin, M.D. and negligent nondisclosure of risks arising from cataract surgery performed on appellant Maude Goodrich's left eye.

Mrs. Goodrich began experiencing vision problems at age 63, approximately ten years before she agreed to undergo cataract surgery on December 12, 1979. She consulted with Group Health opthalmologists every six months who prescribed different glasses to alleviate her vision difficulties. She sought a second opinion from Dr. McCannel, an opthalmologist recommended to her. McCannel alleges that in April of 1979 a Group Health physician discussed cataract surgery with Mrs. Goodrich and explained to her the risks and benefits of the procedures. Mrs. Goodrich denies discussions with the Group Health physician concerning surgery.

Mrs. Goodrich first saw Dr. McCannel on November 20, 1979. After reviewing the results of Mrs. Goodrich's eye examination, Dr. McCannel recommended removal of the cataract in her left eye and the implantation of an artificial lens. Mrs. Goodrich admitted she was aware that the procedure recommended by Dr. McCannel was elective and that not having surgery was an alternative which she could consider.

Mrs. Goodrich was trained as a nurse and worked as a supervisor of nurses in a number of area hospitals before her retirement in 1970. She testified that she was generally familiar with the anatomy of the eye and risks attendant to any surgical procedure. She further testified that she had done some reading in the popular press and a Harvard medical publication about the successful results of recent cataract surgeries. She learned from her readings that some eyes were not suitable for any artificial lens implant.

During her initial examination Mrs. Goodrich asked Dr. McCannel if her eyes were suited for the procedure he recommended. Dr. McCannel replied "[n]o problem." Mrs. Goodrich testified that other than Dr. McCannel's recommendation and terse response to her single question no other information concerning possible risks or alternative treatments was given at the first examination. Dr. McCannel admitted that he did not explain to Mrs. Goodrich the alternatives to the procedure he recommended or possible risks associated with it.

After thinking it over for three weeks, Mrs. Goodrich decided to undergo the recommended surgery. She testified that her decision rested on the recommendation and response of Dr. McCannel, the positive results her relatives had with their cataract surgeries, and her own belief, gained from her readings, that a healthy person need not worry about the risks of cataract surgery. A second appointment with Dr. McCannel was scheduled on December 11, 1979 to measure her eye for the lens im-

plant and make preparations for her surgery the next morning.

At her second visit to Dr. McCannel's office Mrs. Goodrich was given a four page informed consent form by one of Dr. McCannel's technicians to read and sign. This informed consent form was developed by a national group of physicians and attorneys for patients ready to undergo cataract surgery with or without lens implantation and was approved by the Federal Food and Drug Administration. The consent form begins by detailing several alternatives to cataract surgery including the option of not having surgery at all. It then lists the complications of both cataract surgery and a subsequent lens implantation. A detached retina and bleeding are listed as potential complications associated with each procedure.

After reading fully the consent form, Mrs. Goodrich authorized the cataract surgery with the artificial lens implantation, the procedure recommended to her by Dr. McCannel. She admitted that before signing the form, she understood its purpose, the possible risks listed, and the benefits that could result if the surgery were successful.

Mrs. Goodrich met with Dr. McCannel briefly during her second examination. They did not discuss the surgery nor did Dr. McCannel explain further the risks of the surgery or alternative forms of treatment available to her.

From Dr. McCannel's office, Mrs. Goodrich went directly to Abbott-Northwestern Hospital where she spent the night in preparation for her cataract surgery. Opthalmologists employ one of two different procedures in performing cataract surgery. Dr. McCannel used the intracapsular technique to remove the lens from Mrs. Goodrich's left eye. In an intracapsular procedure, the entire lens is taken out along with the zonular fibers (guy wires) attaching the lens to the surrounding lens capsule. Before Mrs. Goodrich's surgery, Dr. McCannel had performed 12,000 to 15,000 intracapsular procedures. It was his opinion that the intracapsular procedure was pref-

erable because it was the treatment of choice among opthalmologists at that time and he was more familiar with it.

The second method employed is the extracapsular procedure. In this procedure the posterior portion of the lens capsule and the zonular fibers are left in the eye, and only the anterior portion of the lens capsule is removed. At the time of Mrs. Goodrich's surgery, Dr. McCannel had performed 30 extracapsular procedures.

Shortly after Mrs. Goodrich's surgery began, Dr. McCannel attempted to remove the lens with a forceps by grasping the anterior portion of the lens capsule. The lens capsule is the clear covering of the lens that is much like the skin of the grape. When he removed the forceps, Dr. McCannel only had a portion of the lens capsule in it rather than the entire capsule and lens. A second attempt was made by Dr. McCannel to retrieve the remaining portion by grasping a torn edge of the capsular material with his forceps. He was unsuccessful, and at that time he saw the lens fall (sublux) into the vitreous of the eye. In most cases the lens would be unable to fall into the vitreous, because the hyaloid membrane, on which the len sits, would halt penetration. (The vitreous is that portion of the eye resting between the retina in the rear and the iris and pupil in front. For most individuals the consistency of the vitreous is like gelatin. However, in some elderly people the consistency changes from gelatin-like to a combination of gelatin in the anterior portion of the vitreous and "water" or liquid in the posterior portion.) However, in Mrs. Goodrich's case her entire vitreous was liquid and the hyaloid membrane had deteriorated. Her condition, referred to as "liquid vitreous," is considered rare. In the more than 10,000 identical surgeries performed by Dr. McCannel, he encountered this problem only once.

After the lens fell into the vitreous, Dr. McCannel called in Dr. LeWin, a vitrio-retinal surgery specialist, to remove the lens and remaining capsule from the vitreous. Dr. LeWin's examination of Mrs. Goodrich

revealed blood inside the eye. He successfully removed the lens with a special surgical instrument without causing any additional bleeding. At that time Dr. LeWin was unable to determine whether any damage had occurred to the retina because of the blood in the vitreous.

Mrs. Goodrich was examined by Dr. LeWin on December 20, 1979. There was still blood in the vitreous, so a complete visual inspection of the retina was impossible. A B-Scan, an alternative procedure used to view the retina, was performed. Results of this procedure showed the retina to be flat. On January 10, 1980, Dr. LeWin could fully visualize the retina because most of the blood had cleared. He noticed for the first time a massive retinal tear. Surgery was performed immediately to reattach the torn retina.

Her retina detached a second time when it was pulled away from its base by a condition known as massive vitreous retraction (shrinkage of the vitreous gel). Dr. LeWin testified that after the second retinal detachment Mrs. Goodrich's eye was irreparable. Approximately four years after her surgery she had the left eye removed.

Dr. McCannel testified that although it was probable that the retinal detachment resulted from the surgeries, he could not say the surgeries caused her loss of vision. Dr. LeWin identified three possible causes for the shrinkage of the vitreous gel and resulting retinal detachment: (1) spontaneous dialysis; (2) blood in the vitreous; (3) the surgeries. It was his opinion that massive vitreous retraction could have occurred even if there had been no surgeries.

Before trial, Mrs. Goodrich moved to amend her complaint to allege that Dr. McCannel was negligent in performing the surgery because of an alleged vision impairment. Dr. McCannel also had cataracts in his eyes which were removed three weeks after he performed surgery on Mrs. Goodrich. Dr. McCannel and Dr. LeWin agreed to the amendment subject to the trial court's consideration of their motion in limine to exclude all evidence of Dr. McCannel's eye condition. The basis for the motion was that mention of Dr. McCannel's cataract would unduly prejudice his defense in the absence of independent expert medical testimony to show that his vision problem interfered with his surgical abilities. The trial court agreed to consider all medical evidence regarding McCannel's cataract in camera before determining whether it would allow the evidence to be heard by the jury.

When Mrs. Goodrich's expert, Dr. McGraw, was unable to establish to the court's satisfaction a deviation by Dr. McCannel from a recognized standard of care by operating with his alleged vision problem, the trial court granted the motion in limine. Mrs. Goodrich went ahead with trial on the remaining theory of negligent nondisclosure.

At the close of Mrs. Goodrich's case-in-chief, the trial court granted Dr. McCannel's motion for directed verdict, ruling that Mrs. Goodrich had failed to establish the element of causation in her negligent nondisclosure claim. Mrs. Goodrich appeals from the entry of judgment only, electing not to bring a motion for new trial based on the trial court's evidentiary rulings.

## ISSUES

1. Did the trial court properly direct a verdict against Mrs. Goodrich because she failed to prove that the undisclosed risk materialized in harm?

2. Does Mrs. Goodrich's failure to move for a new trial preclude appellate review of alleged evidentiary errors at trial?

## ANALYSIS

1. The standard governing appellate review of the grant of a motion for directed verdict is identical to that used by the trial court in its initial determination. *Plutshack v. University of Minnesota Hospitals*, 316 N.W.2d 1, 5 (Minn.1982). The *Plutshack* court stated:

A motion for directed verdict presents a question of law regarding the sufficiency

of the evidence to create a fact question for the jury's decision. For purposes of the motion, the trial court must consider the record in its entirety and treat as credible the evidence for the adverse party and all inferences that may reasonably be drawn from that evidence. Not every conflict in the evidence, however, gives rise to a jury question. The trial court should direct a verdict for the party in whose favor the evidence is overwhelmingly predominant even if there is some evidence for the adverse party.

*Id.* (citation omitted).

Mrs. Goodrich maintains the trial court erred in granting Dr. McCannel's motion for a directed verdict on the element of causation. Rather than require her to establish a connection between the specific risk and the ultimate harm, as the trial court did, she argues the better rule would be to prove causation by establishing a connection between the surgery and her loss of vision. To accept her argument, however, would require this court to reconsider the well-established rule first stated in *Cornfeldt v. Tongen,* 295 N.W.2d 638 (Minn.1980) (Cornfeldt II).

■ To establish causation in a negligent nondisclosure claim, the plaintiff must introduce expert testimony showing that it is more probable than not that the undisclosed risk materialized in harm. *See Reinhardt v. Colton,* 337 N.W.2d 88, 96 (Minn.1983); *Plutshack,* 316 N.W.2d at 9; *Cornfeldt v. Tongen,* 295 N.W.2d 638, 640–641 (Minn.1980).

■ Mrs. Goodrich admitted at trial and concedes on appeal that she was unable to establish by expert testimony what caused the massive vitreous retraction. The undisclosed risk was the lens falling into the vitreous. It was Mrs. Goodrich's theory that the vitreous retraction was caused by blood in the vitreous which in turn was the result of trauma to the eye when the lens fell into the vitreous. However, there is no evidence in the record establishing a connection between the specific risk (lens falling into the vitreous) and the shrinkage of the vitreous gel and resulting detached retina.

■ 2. Mrs. Goodrich urges this court to review several evidentiary rulings made by the trial court, despite the fact she has not raised such alleged errors in a motion for new trial. She argues that since the trial court has already considered fully each of the issues she now raises on appeal, a motion for a new trial would be a futile gesture that would serve no purpose. Her argument is not persuasive in light of this court's consistent rule mandating a motion for new trial before review of alleged trial court errors can occur.

In *Pierce v. National Farmers Union Property and Casualty Co.,* 351 N.W.2d 366, 368–369 (Minn.Ct.App.1984), and most recently in *Cogswell v. Eichenberger,* 371 N.W.2d 561, 562–563 (Minn.Ct.App.1985), this court has held that an appellant must first move for a new trial and assign error on evidentiary matters before they may seek appellate review of those alleged errors. Because Mrs. Goodrich did not move for a new trial, the evidentiary issues raised in this appeal were not properly preserved for review by this court.

## DECISION

The trial court's order directing a verdict in favor of Dr. McCannel is affirmed. Mrs. Goodrich has not established a causal connection between the specific risk and her ultimate loss of vision.

Mrs. Goodrich's failure to make a motion for a new trial precludes this court from reviewing all evidentiary issues raised by her on appeal.

Affirmed.