WESTERN SURETY AND CASUALTY CO., Appellant,

v.

GENERAL ELECTRIC COMPANY, Respondent.

No. C7-88-949.

Court of Appeals of Minnesota.

Dec. 27, 1988.
Review Denied Feb. 22, 1989.

Sally A. Johnson, Bruce Jones, Faegre & Benson, Minneapolis, for respondent.

Heard, considered, and decided by WOZNIAK, C.J., and HUSPENI and SCHUMACHER, JJ.

## OPINION

WOZNIAK, Chief Judge.

Plaintiff Elroy Pinkert commenced an action against respondent General Electric Company (GE) for strict liability, negligent design, and breach of an implied warranty of fitness for a particular purpose and an implied warranty of merchantability for injuries suffered in an alleged explosion of a GE 6014 headlight in his 1978 Ford Fiesta. Pinkert's wife also asserted claims.

Appellant Western Casualty and Surety (Western) paid its insured, Pinkert, approximately $50,000 in economic loss benefits under Minnesota's No–Fault Automobile Insurance Act. Western asserted its subrogation rights and intervened as a party plaintiff. After the Pinkerts and GE settled, Western proceeded as the sole plaintiff.

The trial court granted GE's motion for directed verdict after Western's case in chief. Western appeals from the judgment in favor of GE, but challenges only the trial court's directed verdict on the strict products liability cause of action. We affirm.

## FACTS

Elroy Pinkert purchased a 1978 Ford Fiesta in the summer of 1983. The car's headlights apparently were installed in 1978. Pinkert did not testify as to who sold him the car or about how many people had owned the car previously. Pinkert also did not testify about whether the headlight underwent any unusual abuse under his ownership or that of the previous owners.

On January 12, 1984, when he stopped at a gas station on his way to work, Pinkert noticed the right headlight of his 1978 Ford Fiesta was not working. He testified he tapped the light, it came on, and he went into the station.

On his way out of the station, Pinkert noticed the light was out again. He testified that he tapped the center of the light three or four times, tapping with the tips of his fingers. After the last tap, the light "exploded." He stated that he had never had any problems with the light, nor had he ever seen any cracks or chips in it. He did not indicate whether the headlight had ever been changed.

Both Pinkert and Dr. Bruce Cunningham, a plastic surgeon, testified that Pinkert suffered extensive injuries to his wrist. Dr. Cunningham testified that a crushing or widely distributed force caused partial or complete severance of the tendons on the palm side of Pinkert's right wrist. The station attendant also testified that Pinkert returned to the store with a bloody wrist.

Dr. William Bauer, a glass expert, testified on Western's behalf about the forces which cause glass to break. He testified that glass breaks when subjected to tension, but withstands compression very well because tension pulls glass apart while compression pushes it together. Bauer stated that when a person presses on glass, compression occurs on the surface and tension occurs on the underside of the glass.

According to Bauer, the cooling or "annealing" process affects tensile strength (the ability of glass to resist breakage) by sometimes allowing formation of bubbles or sags in the seal between the light and its reflector. When tensile strength is exceeded, glass breaks from the underside. By piecing the remains together and by examining the direction of the fracture movement, one can determine the origin of the failure and the side of the glass that was under tension. Contamination by solid particles also may affect tensile strength.

Bauer then testified regarding several photographs of the remains of the Pinkert headlight. Bauer identified an *area* of origin of failure, but not *the* origin, because the pieces from the origin were missing. From two pictures, he concluded that the direction and type of force near the failure indicated the fracture occurred on the underside of the glass near the seal, but he was not certain whether the fracture actually started in the lens, the seal, or the reflector. In addition, Bauer identified a bubble in the seal, a sag and a cluster of bubbles in the seal, and red particles throughout the light. The sag, bubbles, and red particles were not in the headlight's area of failure. Bauer believed these "anomalies," not found in a normal headlight, were present at manufacture. He stated that the types of anomalies in the Pinkert headlight were such that they could have been the origin in a different headlight under different circumstances.

Bauer testified that to a reasonable degree of engineering certainty, each "defect" was enough to cause a fracture from a concentration of the light's inherent thermal stresses. He believed that the "defects," combined with excessive thermal stresses caused by improper annealing and Pinkert's "modest tap," if found in the area of origin, could have caused the glass to break. He also testified that to a reasonable degree of engineering certainty, the thermal stresses and the stresses caused by a defect could have resulted in some of the glass fragments propelling out of the headlight. Bauer admitted on cross-examination, however, that, by "defect," he meant any discontinuity, imperfection, or irregularity in the headlight. He stated that by "defect" he meant anything that should not be in the headlight. He did *not* use the word defect in a legal sense.

Upon GE's motion, the trial court directed a verdict in favor of GE after Western's case in chief. On appeal, Western argues that the trial court based its decision to grant a directed verdict in favor of GE on the court's belief that there was insufficient proof on the issue of defect. GE argues that the trial court correctly granted a directed verdict because Western failed to establish a prima facie case of strict products liability.

## ISSUE

Did the trial court err in granting a motion for directed verdict against appellant because appellant failed to establish a prima facie case of strict products liability?

## ANALYSIS

*Standard of Review*

The motion for directed verdict is a question of law regarding the sufficiency of the evidence to present a fact question for the jury. *Plutshack v. University of Minnesota Hospitals*, 316 N.W.2d 1, 5 (Minn.1982). At trial, a directed verdict is appropriate when the evidence, taken as a whole and viewed in the light most favorable to the adverse party, would mandate the trial court to set aside a contrary verdict as manifestly against the weight of the evidence. *Nelson v. Wilkins Dodge, Inc.*, 256 N.W.2d 472, 475 (Minn.1977). On appeal, an appellate court must apply the same standard. *Plutshack*, 316 N.W.2d at 5. The appellate court must treat the adverse

party's evidence as credible, and draw all reasonable inferences from that evidence. *Wohlfeil v. Murray Machinery, Inc.,* 344 N.W.2d 869, 872 (Minn.Ct.App.1984). Even viewing the evidence in the light most favorable to Western, we agree with the trial court that Western did not present the evidence necessary to sustain a cause of action for strict products liability.

### Strict Products Liability

In order to recover under the theory of strict [products] liability, the plaintiff must establish (1) that the defendant's product was in a defective condition unreasonably dangerous for its intended use, (2) that the defect existed when the product left the defendant's control, and (3) that the defect was the proximate cause of the injury sustained.

*Bilotta v. Kelley Co., Inc.,* 346 N.W.2d 616, 623 n. 3 (Minn.1984) (citation omitted). The trial court directed a verdict in favor of GE because Western failed to establish a prima facie case of strict products liability.

Specifically, the trial court found that Dr. Bauer could not testify that there was a defect present or that there was a defect present when the headlight left GE's control. The trial court also found that Bauer only identified the red particles, the sag, and the bubble as "representative anomalies," not defects that resulted in the break. The trial court noted that Dr. Bauer could not even identify an origin of failure and concluded that a jury would be forced to engage in speculation in order to find a defect existed. Finally, the trial court found that Western had not established any causal connection between the anomalies and the break. We agree.

### Defective condition

■ In a strict products liability action, a plaintiff may use circumstantial evidence to prove the existence of a defect. *Lee v. Crookston Coca–Cola Bottling Co.,* 290 Minn. 321, 188 N.W.2d 426 (1971); *Holkestad v. Coca–Cola Bottling Co.,* 288 Minn. 249, 180 N.W.2d 860 (1970); *Mattson v. Rochester Silo, Inc.,* 397 N.W.2d 909 (Minn.Ct.App.1986), *pet. for rev. vacated* (Minn. Aug. 15, 1987). In essence then, a case such as this one is really a strict liability version of *res ipsa loquitur.*

When a plaintiff has proved that he was injured by a product claimed to have been defective, and where the claimed defect is such that there is circumstantial evidence from which it can be inferred that it is more probable than not that the product was defective when it left defendant's hands, absent plaintiff's own want of care or misuse of the product, there is an evidentiary basis for submitting the issue of liability to the jury on both the theory of negligence and strict liability in tort. Of course, the factor essential to the application of res ipsa loquitur—that it must be the kind of event which does not occur in the absence of negligence—is a circumstance tending to prove a defect and not a prerequisite for the application of strict liability in tort. *However, the inference from the circumstantial evidence taken as a whole, which we repeat is the underlying basis of the doctrine of res ipsa, would permit recovery against both manufacturer and retail seller on the theory of strict liability,* leaving them to pursue their remedies of contribution and indemnity.

*Holkestad v. Coca–Cola Bottling Co.,* 288 Minn. 249, 257, 180 N.W.2d 860, 863, 865–66 (1970) (emphasis added) (citation omitted).

■ Here, Bauer testified that the headlight was contaminated in several ways, but he could not identify *the* origin of failure. GE contends that Bauer's inability to testify that a defect existed in the area of origin is fatal to Western's case. We agree.

A plaintiff may use circumstantial evidence to establish a prima facie case, but the evidence may not be such that a jury would need to engage in speculation. *Smith v. Runk,* 425 N.W.2d 299, 301 (Minn.Ct.App.1988). Based on the evidence presented at trial, Western's own expert was unable to state that the headlight was defective; and, if he could not, any such conclusion by the jury would have been pure speculation.

Dr. Bauer testified that the headlight had bubbles and red particles (possibly rust) in it. It also had a sag in the seal between the lens and the reflector. None of the "anomalies" was in the area where the light began to break. Bauer could not testify that any defects of a type sufficient to cause breakage were present in the area of origin. In fact, as we noted earlier, Bauer did not use the word "defect" in a legal sense and admitted that the seriousness of a "defect" could vary a great deal. Nor did he testify that any of the light's anomalies or defects was an unreasonably defective condition. The evidence offered at trial would not have supported a jury finding of an unreasonably dangerous defective condition.

We believe the trial court summed up Dr. Bauer's testimony best:

> [T]hat two-letter word "if" is the fulcrum upon which the whole decision turns. He can't do anything other than speculate as to its presence, and correspondingly neither can the jury.

> \* \* \* \* \* \*

> [T]he witness can more or less identify an area of origin of breaking. He cannot identify the origin of the breaking. The defects \* \* \* in the form of the smears and the bubbles and the red material he once referred to as rust, are not within the area of origin, and that there isn't any proof here that a defect existed. As a matter of fact, \* \* \* he summed up his testimony by saying—I think this is an exact quote—"*if* there was a defect present in the area of origin, that defect would have been the point at which the failure"—or I think he called it "catastrophic failure would have begun."

(Emphasis added by the trial court.) We believe that Dr. Bauer's testimony was not sufficient to present a question for the jury on the issue of defect.

### Causation

■ GE argues that the trial court found Western did not establish that a defect in GE's headlight caused Pinkert's injuries. At GE's motion for directed verdict, the trial court also found that Western had not proved causation or the existence of a defect when the light was in GE's control. We agree.

A plaintiff in a strict products liability action need not present testimony of a specific cause of the event leading to an injury. *Hudson v. Snyder Body, Inc.*, 326 N.W.2d 149, 155 (Minn.1982). Nevertheless, Western did not present sufficient evidence on the issue of causation.

Here, no witness testified that a defect caused the headlight to explode. Dr. Bauer was unable to state that any of the identified anomalies or defects was the fracture's point of origin or that the origin had an anomaly like the ones observed elsewhere in the light. Dr. Bauer could state that through a process of elimination he identified an area of fracture origination. The anomalies he observed, however, were not in the origin. Dr. Bauer never stated that improper annealing or the sag caused the headlight to break. He never attributed the breakage to a defective condition present in the origin. As the trial court expressed it:

> [T]hese anomalous conditions really aren't even defects to the extent that "defect" here is talking about a causal connection between the failure and the injury because they didn't result in it breaking and they didn't result in the glass cutting the man's hand.

In addition, the actual cause of the fracture was not and never will be discoverable because of the missing pieces:

> Q. [GE's attorney] \* \* \* So it's fair to say, Doctor, that you weren't able to determine whether the fractures started in the lens, in the seal, or in the reflector? You were merely able to limit it to an area that you had indicated on the exhibit?

> A. [Dr. Bauer] That's right, because of the missing glass.

There was insufficient evidence to establish that a defect present in the area of origin caused the explosion. Consequently, there was insufficient evidence to submit the question to the jury.

*Defect at surrender of control*

If a plaintiff proves injury by a defective product and the defect is such that there is circumstantial evidence allowing a jury to infer it is more probable than not that the product was defective in the defendant's hands, "there is an evidentiary basis for submitting the issue of liability to the jury on * * * the theory of * * * strict liability in tort." *Lee*, 290 Minn. at 330–31, 188 N.W.2d at 433. Western did not submit sufficient evidence to prove a defect or causation. Therefore, it could not establish that a defect existed when the headlight was in GE's control.

■ A party need not eliminate all possible causes of a glass explosion. *Holkestad*, 288 Minn. at 255, 180 N.W.2d at 865. But where lapse of time and substantial opportunity for mishandling of a product by third parties make it equally probable a defective condition developed after leaving the defendant's control, neither the principles of res ipsa loquitur nor strict liability will support a finding of liability. *Id.* at 255–56, 180 N.W.2d at 865.

■ Pinkert purchased his car five years after it was manufactured. Western presented no evidence to eliminate the possibility of mishandling by the previous owner or owners, or anyone else for that matter. Nor did any witness testify that a defect sufficient to cause an explosion existed at the time of manufacture. The only evidence that possibly could have established that the light was defective at manufacture was Dr. Bauer's belief that the anomalies were present at manufacture. Because the anomalies identified by Dr. Bauer were not linked to the alleged explosion, Western's proof on the issue of whether there was a defect at the time of GE's control was insufficient.

## DECISION

The trial court correctly directed a verdict in favor of respondent after finding appellant had not presented sufficient evidence to present a jury question on the issue of the existence of a defect.

AFFIRMED.