**NC PROPERTIES, LLC, Appellant,**

v.

**Eric LIND, et al., Respondents,**

**Trend Title, LLC, et al., Defendants,**

**ING Bank, FSB, Respondent,**

and

**Eric Lind, et al., Third Party Plaintiffs,**

v.

**Thomas Buslee, et al., Third Party Defendants.**

**No. A10–1672.**

Court of Appeals of Minnesota.

April 19, 2011.

Chad McKenney, Brad Hendrikson, Donohue McKenney Hendrikson & Bergquist, Ltd., Maple Grove, MN, for appellant.

Matthew A. Anderson, Patrick B. Steinhoff, Mackall, Crounse & Moore, PLC, Minneapolis, MN, for respondents Lind, et al.

Michael E. Kreun, Beisel & Dunlevy, P.A., Minneapolis, MN, for respondent-ING Bank.

Considered and decided by
KLAPHAKE, Presiding Judge; MINGE, Judge; and HARTEN, Judge.

## OPINION

HARTEN, Judge.*

The purchase agreement for a real property sale gave appellant, the seller, a mort-

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to    Minn. Const. art. VI, § 10.

gage lien on the home of respondents, the purchasers, who then obtained another home mortgage from respondent bank. After closing, appellant cancelled the purchase agreement and brought this action against the purchasers to enforce appellant's mortgage lien and to obtain a money judgment for alleged breach of contract, misrepresentation, fraud, and civil conspiracy, and against respondent bank for a declaration that appellant's mortgage had priority over the bank's mortgage. The bank counterclaimed for a declaration that appellant's mortgage was no longer a valid lien.

The purchasers moved for summary judgment on the foreclosure and breach of contract claims, and the bank moved for summary judgment on the priority of its mortgage and on the counterclaim. The parties agreed that any summary judgment would be the final, appealable judgment. The district court granted summary judgment to both the purchasers and the bank. Appellant challenges those judgments.

## FACTS

In December 2007, respondents Eric and April Lind (the Linds) agreed to purchase from appellant NC Properties LLC (NC) a parcel of realty and to complete construction of the residence in progress on the realty, which the Linds then planned to sell. NC agreed to provide the Linds with financing. The transaction involved four interconnected documents.

**The purchase agreement,** between the Linds as purchasers and NC as seller, stated that the purchase price included (1)

a down payment of $10,000 cash; (2) a "first" payment of $1,411,000 at the signing of the contract, to be financed by an initial cash advance the Linds would receive from NC under a loan agreement; and (3) an amount needed to complete construction, also to be provided by draws on the loan agreement. The purchase agreement also provided that all amounts owed by the Linds to NC "pursuant to the Loan Agreement shall survive any cancellation of this Contract."

**The loan agreement,** between NC as lender and the Linds as borrowers, stated that (1) the Linds applied for a loan of $2,650,000; (2) NC agreed to make advances to the Linds "from time to time" in an amount not to exceed $2,650,000; (3) the advances would be payable, with interest, according to the terms of the associated promissory note; (4) payment of the advances would be secured by a separate mortgage of up to $365,000 in third position on the Linds' current residence and all improvements made to the property; (5) the Linds would pay NC an origination fee of $25,000; and (6) "[t]his Agreement, the Note and the Mortgage shall survive cancellation of the Purchase Agreement."

**The promissory note,** also between NC as lender and the Linds as borrowers, stated that (1) the Linds would pay NC the principal sum of $2,650,000 or as much thereof as was advanced to them, plus interest;[1] (2) the note was secured by a mortgage; (3) in the event of default, NC could call in the principal and accrued interest; and (4) "THIS PROMISSORY NOTE SHALL SURVIVE THE CANCELLATION OF THE PURCHASE AGREEMENT BETWEEN BORROW-

---

1. The record contains no convincing evidence, and the district court found none, that the Linds received any money from NC. The district court indicated: "The only evidence of draw requests ... is a collection of Draw Request Forms that say 'BankCherokee' at the

top, listing NC Properties as the borrower.... The Court is exceedingly confused by ... these forms ... because ... NC Properties was the lender, not the borrower." NC does not point to any evidence refuting this finding.

ER AND LENDER OF EVEN DATE HEREWITH."

**The mortgage,** between the Linds as mortgagors and NC as mortgagee, provided that (1) it would secure payment for construction advances up to $365,000; (2) it would remain in effect until the promissory note was paid in full; and (3) the property was encumbered by two prior mortgages, one for $125,000 and the other for $480,000. The NC mortgage was recorded on 27 December 2007.

The Linds paid the $10,000 down payment and the $25,000 origination fee, hired contractors, and began work on the property. In April 2008, they refinanced their residence to pay off its first and second mortgages with a mortgage for $675,000 from respondent ING Bank, F.S.C. (ING). This mortgage was recorded on 14 May 2008.

Later in 2008, the Linds became insolvent and defaulted. In July 2008, NC served a notice of cancellation, terminating the purchase agreement unless the Linds cured the default. The default was not cured, and NC cancelled the contract. *See* Minn.Stat. § 559.21 (providing for statutory cancellation of contracts for conveyance of real estate when the purchaser defaults, provided the seller gives appropriate notice of the conditions of default and a fixed amount of time within which the default may be cured).

NC took over the construction on the property, in which it has invested about $2,800,000 and which it is now attempting to sell for $1,900,000.

## ISSUES

1. May a seller who cancels a purchase agreement under Minn.Stat. § 559.21 enforce provisions of other documents related to the sale that do not explicitly reference a down payment?

2. May a seller who cancels a purchase agreement under Minn.Stat. § 559.21 also enforce the provisions of other documents related to the sale? [2]

## ANALYSIS

**Standard of Review**

On appeal from summary judgment, this court determines whether there are any genuine issues of material fact and whether the district court erred in applying the law. *State by Cooper v. French,* 460 N.W.2d 2, 4 (Minn.1990). We view the evidence in the light most favorable to the party against whom summary judgment was granted. *Fabio v. Bellomo,* 504 N.W.2d 758, 761 (Minn.1993). But the nonmoving party "may not establish genuine issues of material fact by relying upon unverified and conclusory allegations, or postulated evidence that might be developed later at trial, or metaphysical doubt about the facts." *Dyrdal v. Golden Nuggets, Inc.,* 689 N.W.2d 779, 783 (Minn. 2004). If there are no genuine issues of material fact, we review the district court's decision de novo to determine if it erred in applying the law. *Art Goebel, Inc. v. North Suburban Agencies, Inc.,* 567 N.W.2d 511, 515 (Minn.1997).

■ "'Money paid or property transferred by the vendee to the vendor is forfeited if the vendee defaults in the per-

---

**2.** In light of our affirmance of the district court's decision that NC's mortgage on the Linds' residence did not survive the cancellation of the purchase agreement, we do not address its decision that NC's claim against ING must be dismissed. ING explicitly and

NC implicitly acknowledged that, given our affirmance under those circumstances, no other decision is possible. NC argues that ING's mortgage is subordinate only if NC's mortgages survive.

formance of the contract and the vendor exercises his right of cancellation.'" *Novus Equities Corp. v. EM–TY P'ship*, 381 N.W.2d 426, 429 (Minn.1986) (quoting *Andresen v. Simon*, 171 Minn. 168, 172, 213 N.W. 563, 564–65 (1927)). Having elected the remedy of statutory cancellation, NC as seller was entitled to retain money or property transferred by the Linds as purchasers. But the district court held that NC is prevented from also seeking a breach of contract remedy unless either (1) the parties intended the mortgage on the Linds' residence to be a down payment or security for a down payment, or (2) language in the documents effectively allowed some of the parties' rights and obligations to survive after the cancellation. The district court concluded that neither of these situations existed. NC disputes those conclusions.

### 1. Was the Mortgage a Down Payment?

NC argues that the documents themselves establish that the Linds' mortgage was a down payment made to induce NC to sell them the property or, alternatively, that the documents are ambiguous and present genuine issues of material fact as to the parties' intent.

### A. The Documents

■ NC claims that the mortgage was actually a down payment that NC was entitled to retain after cancellation. In support of this argument, NC relies on *Novus*, which concerned a $200,000 cash payment and a $200,000 promissory note, secured by a letter of credit, that were listed together as one part of a purchase price; the other part was an unpaid balance of $2 million. *Id.* at 427. None of the items in the purchase price was designated as a down payment. *Id.* at 428.

*Novus* considered whether the promissory note was a down payment:

[A] down payment ... is that part of the purchase price paid by the buyer initially to induce the seller to enter into the contract, thereby conveying equitable title and surrendering possession of the land. It is a kind of entry fee. If the contract is cancelled, the parties understand that the seller keeps this initial payment. The down payment may also be an incentive to the buyer not to default so as not to lose what he has paid down.

. . . .

A promissory note, of course, is property that can be transferred or paid "down" but a difficulty lies in its equivocal nature. . . . To ask, in this context, whether the promissory note is a down payment is a shorthand way of asking whether the parties intended the deferred payments in the note to survive cancellation of the contract for deed.

If the parties agree, we see no reason why a promissory note may not be a down payment or part of a down payment for a contract for deed. . . . *We believe, however, if the parties intend a promissory note to be a down payment, that intent needs to clearly appear.* We say this because of the equivocal nature of the promissory note itself, the law's desire to avoid needless uncertainty in real estate transactions, and also because of the strict foreclosure aspects of a contract for deed cancellation. . . . [T]his court has sought to protect the vendee by not only prohibiting the vendor from collecting deferred, not-yet-due installments, but also from collecting past due installments even if reduced to judgment or if covered by a promissory note. *We hold, therefore, that (1) there is a presumption a promissory note is not a down payment,* and (b) [sic] the

burden of proving a down payment is on the vendor.

*Novus,* 381 N.W.2d at 429–30 (citations omitted) (emphasis added). *Novus* thus concluded that the promissory note for $200,000 was not necessarily a down payment; in fact, it was presumed not to be a down payment. *Id.*

Although none of the items in the *Novus* purchase agreement, including the $200,000 cash payment, had been designated a down payment, the purchaser's action against the seller sought "return of purchaser's $200,000 cash down payment on the theory of unjust enrichment." *Id.* at 427. Thus, the parties apparently considered the $200,000 in cash to be a down payment, in contrast to the $200,000 promissory note.

Here, the purchase agreement is the only document to reference a down payment, and it states that the down payment is $10,000 cash.[3] Nothing in any of the four documents even implies, much less specifies, that the parties intended the mortgage to be a down payment. Even if the parties intended that the mortgage be a down payment or security for a down payment, that intent does not "clearly appear" or appear at all. *See id.* at 429. Thus, applying *Novus,* the mortgage is presumptively not a down payment.

NC argues that there were actually two down payments: one of $10,000 cash and the other of $1,411,000 due at signing and financed by the loan agreement, for which the mortgage provided partial security. For this argument, it relies on *Andresen v. Simon,* 171 Minn. 168, 169, 213 N.W. 563, 563 (1927) (concerning a contract for deed purchase price that included $5,000 in cash and a purchaser who gave a note for $5,000, secured by a mortgage). *Andresen*

concluded that evidence sustained the finding that the seller had accepted the note and mortgage in lieu of cash because the seller would not have sold without a down payment. *Id.* at 171–172, 213 N.W. at 564–65. But *Andresen* is distinguishable: the mortgage here was not given in lieu of, or as security for, the cash down payment. As the district court noted, "[t]he mortgage was plainly security for future advances under the construction loan, which . . . would trigger future . . . not yet due installments on the contract, and since not yet due installments on the contract cannot be collected once the contract is cancelled, neither can the security for those not yet due installments be called in."

NC does not satisfy the vendor's burden of proving that the mortgage was, or was intended to be, a down payment. *See Novus,* 381 N.W.2d at 430.

### B. Alleged Ambiguity

The district court found "that the language of the contract is not ambiguous as to whether the parties intended the mortgage as a down payment, or as security for a down payment. No extrinsic evidence of the parties' intent should be taken on the issue."

█ NC argues that the purchase agreement is ambiguous because, while the parties discussed a $35,000 down payment, the purchase agreement provides for a $10,000 down payment and the loan agreement provides for a $25,000 origination fee. But the only support for this alleged ambiguity is the affidavit of NC's principal, who recounts a conversation with Eric Lind. This results in a circular argument: NC depends on parol evidence to establish ambiguity to make parol evidence admissible. Consideration of facts outside the four cor-

---

**3.** The loan agreement refers to an "origination fee" of $25,000, which the Linds also paid, but this was in addition to, not part of, the $10,000 down payment.

ners of a contract is admissible only if the contract language, by itself—i.e., not in light of what one of the parties claimed was intended—is ambiguous. *See In re Trust Created Under Agreement With McLaughlin,* 361 N.W.2d 43, 44 (Minn. 1985) (applying rule in context of trust agreement). The four documents here are consistent individually and collectively.

NC also relies on *Novus,* which concluded that "whether [the purchaser's $200,000 promissory] note was a down payment or simply additional evidence of the contract debt [was] a question of fact" that could not be resolved on summary judgment. 381 N.W.2d at 430. But *Novus,* having concluded that a promissory note was presumptively *not* a down payment, also concluded that, because the purchase agreement "provided, separately from 'the *unpaid* balance of the Purchase Price,' the $200,000 note secured by a letter of credit[,] . . . the evidence strongly suggests the note was a down payment intended to survive cancellation." *Id.* Here, the mortgage is presumptively not a down payment, and no evidence, other than the parol evidence provided by the affidavit of NC's principal, suggests that the mortgage was intended to survive cancellation. The district court correctly found that no ambiguity justified the consideration of extrinsic evidence.

Accordingly, we hold that the documents do not provide a basis for finding either that the parties intended the mortgage to be a down payment or that extrinsic evidence is necessary to ascertain the parties' intent.

### 2. Survival After Cancellation

▆▆▆ The district court asked the rhetorical question, "[M]ay parties contract

for one party's receipt of double recovery?", and answered it, "The Court thinks not." [4] NC acknowledges that, in cancelling the purchase agreement, it elected its remedy, but argues that, by including in the various documents statements that they survived cancellation of one another, NC contracted for a double recovery.

> The doctrine of election of remedies requires a party to adopt one of two or more coexisting and inconsistent remedies which the law affords the same set of facts. The purpose of the doctrine is not to prevent recourse to any particular remedy but to prevent double redress for a single wrong.

*Christensen v. Eggen,* 577 N.W.2d 221, 224 (Minn.1998); *see also Rudnitski v. Seely,* 452 N.W.2d 664, 666 (Minn.1990) (a vendor who cancels a contract under Minn.Stat. § 559.21 "will be held to have elected a remedy and will thereafter be prevented from receiving double recovery by seeking damages for breach of contract"); *Neuman v. Demmer,* 414 N.W.2d 240, 243 (Minn.App.1987) ("Forfeiture rules of Minnesota contracts for deed are harsh enough, without allowing vendors to keep the land and collect unpaid installments as well."), *review denied* (Minn. 15 Jan. 1988). Here, the wrong was the Linds' default, and NC elected the remedy of cancelling the purchase agreement. Holding the Linds to their obligations under the cancelled agreement would give NC "double redress for a single wrong." *See Christensen,* 577 N.W.2d at 224.

To support its argument that the Linds' obligations survive the cancellation of the contract, NC relies on *First Constr. Credit v. Simonson Lumber,* 663 N.W.2d 14 (Minn.App.2003), and *Nat'l City Bank v.*

---

4. The district court noted that it "hesitate[d] to invalidate portions of an agreement, especially where both parties to the agreement [were] sophisticated entrepreneurs" but con-

cluded that it "simply [could not] sustain a cause of action based on a contract that legally ceased existence once cancellation took effect."

*Lundgren,* 435 N.W.2d 588, (Minn.App. 1989), *review denied* (Minn. 29 Mar. 1989). Both cases are distinguishable. *First Constr. Credit* involved the survival of obligations after the closing of a purchase agreement, not after its cancellation, and *Nat'l City Bank* involved the survival of a guarantor's obligations after the debtor's obligation had been discharged by operation of law.

The district court lawfully found that NC, having elected to cancel the purchase contract, cannot now pursue claims under the cancelled contract.

## DECISION

Because nothing in any of the documents executed in connection with the parties' cancelled transaction indicated that NC's mortgage on the Linds' home was intended as a down payment and because a party, having elected the remedy of cancellation of a purchase agreement, cannot also enforce terms of other documents related to that agreement, the district court did not err in granting summary judgment.

**Affirmed.**