*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A16-0570**

In Re the Custody of N.O.K.; Jason Michael Krause, petitioner,
Appellant,

vs.

Marissa Lauren Gomez,
Respondent.

**Filed November 7, 2016
Affirmed; motion granted
Larkin, Judge**

Scott County District Court
File No. 70-FA-14-13604

Debra Julius, Julius & Shaughnessy, Prior Lake, Minnesota (for appellant)

Ronald B. Sieloff, Sieloff and Associates, P.A., Eagan, Minnesota (for respondent)

Considered and decided by Smith, Tracy M., Presiding Judge; Larkin, Judge; and Rodenberg, Judge.

### U N P U B L I S H E D   O P I N I O N

**LARKIN**, Judge

In this child-custody and parenting-time dispute, appellant-father challenges the district court's order awarding sole legal and sole physical custody of the parties' minor

child to respondent-mother and establishing parenting time for appellant-father. Respondent-mother moves to strike certain documents on the grounds that they are not part of the district court record. We affirm the district court's custody and parenting-time order and grant respondent-mother's motion to strike.

## FACTS

Appellant-father Jason Michael Krause and respondent-mother Marissa Lauren Gomez are the parents of N.O.K., born August 28, 2013. On July 17, 2014, father filed a "Petition to Establish Custody and Parenting time," seeking joint legal and joint physical custody of N.O.K. and proposing a parenting-time schedule. Father's attorney and mother's attorney agreed to an indefinite extension for mother to file an answer and counterpetition. On November 20, 2014, the district court issued a temporary order awarding mother sole legal and sole physical custody of N.O.K. On August 20, 2015, mother filed an answer and "Counter-Petition to Establish Custody and Parenting time," seeking sole legal and sole physical custody of the child, parenting time as agreed to by the parties, parenting-time exchanges at the Savage Police Department, and a name change for the child.

On August 25, 2015, the parties appeared before the district court for an evidentiary hearing on the petition and counterpetition. Father was not represented by counsel at the hearing. Father moved to dismiss his petition, and the district court granted the motion. The district court offered to continue the hearing on mother's counterpetition given its late filing. The district court took a 41-minute recess for father to talk with his family and to

consider whether to go forward with the hearing that day. After the recess, the following exchange occurred between the district court and father:

> Q: All right. . . . The clerk has advised me that, Mr. Krause, you are ready to go forward today?
> A: Yes.
> Q: All right. And you still agree that Ms. Gomez should be awarded sole legal and sole physical custody, or is that something you want the court to decide today?
> A: The court to decide today.

The district court proceeded with the evidentiary hearing on mother's counterpetition. Father and mother testified at the hearing, as did several relatives and father's friend K.B. After the evidentiary hearing, the parties submitted letter briefs for the district court's consideration. Mother's brief requested parenting time as agreed to by the parties. Father's brief proposed a parenting-time schedule whereby he and mother would each have 50% physical custody and parenting time on an alternating weekly basis.

The district court ultimately granted mother's request for sole legal and sole physical custody of N.O.K., denied mother's request for parenting time as agreed to by the parties, set a parenting-time schedule, ordered that parenting-time exchanges occur at the Burnsville Police Department unless otherwise agreed to by the parties, and denied mother's request for a name change for N.O.K.

The district court noted the following circumstances in support of its custody determination. N.O.K. has lived with mother since birth. Mother has had the vast majority of parenting time with the parties' child. Father's proposed "50/50" parenting-time schedule would be a substantial change in the child's life. The child's needs are being met

3

in mother's care. Mother, together with her family, has provided for the child's physical and emotional needs and has brought the child to his regular doctor.

Father works a seasonal job. Beginning in April, May, or June, and ending in October or November, depending on the weather and need, father works from early in the morning until late at night Monday through Saturday. Because of father's work schedule, father is unavailable to be with the child for most of the day during his busy season. Mother also works during the day, but she typically is done working by 3:30 p.m. and has arranged for daycare for the child while she is at work. Mother picks up the child from daycare and spends the rest of the day and evening with the child. Mother's schedule is structured and predictable.

At the time of the hearing, mother had been living with her parents in the same home for approximately two years. Mother grew up in the same community and has strong ties there. Father had been living with his family for a few months. Father has lived in Belle Plaine, Prior Lake, and Bloomington since N.O.K.'s birth.

When the child was a newborn, the parties had an argument and mother attempted to leave with the child to "allow things to cool down." When mother attempted to leave, father grabbed the car seat in which the child was seated and would not allow mother to leave with the child. Father jerked the car seat and the child out of mother's arms and would not allow mother access to the child for approximately an hour.

In November 2013, the parties had an argument at a photo studio. Mother attempted to leave with the child and the child's maternal grandmother, in maternal grandmother's car. While mother loaded the child into her mother's car, father continued to argue with

mother and started banging on the car. Father got into another vehicle, followed maternal grandmother's car out of the parking lot, and chased it on the highway. At one point, father got in front of maternal grandmother's car and abruptly hit the brakes, causing a dangerous situation.

In addition to these incidents, father has engaged in name-calling, sent offensive text messages, and posted negative and derogatory comments on social media. All of this behavior was directed at mother. Mother and her family have engaged in name-calling and have been verbally aggressive and abusive towards father as well. There is a significant amount of animosity between the parties and their respective families. Police have been called a number of times prior to and during parenting-time exchanges. The parties do not take adequate measures to minimize exposure of the child to these parental conflicts, and the parents do not utilize any dispute-resolution methods.

Father appeals the district court's custody and parenting-time order.

## D E C I S I O N

Before addressing father's specific assertions of error, we note several principles that govern our review. First, to be properly before an appellate court for decision, an issue must be preserved for review in the district court. *Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn. 1988). Although some accommodations may be made for pro se litigants, they are generally held to the same standards as attorneys. *Fitzgerald v. Fitzgerald*, 629 N.W.2d 115, 119 (Minn. App. 2001). Thus, a complaining party who was not represented by counsel in the district court still must properly preserve issues for review.

5

Second, "on appeal error is never presumed. It must be made to appear affirmatively before there can be reversal. . . . [And] the burden of showing error rests upon the one who relies upon it." *Loth v. Loth*, 227 Minn. 387, 392, 35 N.W.2d 542, 546 (1949) (quotation omitted). An appellate court "does not exist for the purpose of demonstrating to the litigants through a detailed statement of the evidence that its decision is right." *Engquist v. Wirtjes*, 243 Minn. 502, 503, 68 N.W.2d 412, 414 (1955).

Third, to obtain relief on appeal, the complaining party must show that the error prejudiced the complaining party. *See* Minn. R. Civ. P. 61 (providing that courts "must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties"). And the complaining party must demonstrate that this prejudice is significant. *See, e.g.*, *Wibbens v. Wibbens*, 379 N.W.2d 225, 227 (Minn. App. 1985) (declining to remand a district court's child-support order based on a de minimis error).

"Appellate review of custody determinations is limited to whether the [district] court abused its discretion by making findings unsupported by the evidence or by improperly applying the law." *Pikula v. Pikula*, 374 N.W.2d 705, 710 (Minn. 1985). The district court's findings must be sustained unless they are clearly erroneous. *Id.* "When determining whether findings are clearly erroneous, an appellate court views the record in the light most favorable to the [district] court's findings." *In re Custody of N.A.K.*, 649 N.W.2d 166, 174 (Minn. 2002). And "appellate courts defer to [district] court credibility determinations." *Vangsness v. Vangsness*, 607 N.W.2d 468, 472 (Minn. App. 2000).

In reviewing a custody determination, the law "leaves scant if any room for an appellate court to question the [district] court's balancing of best-interests considerations." *Id.* at 477.

## I.

Father argues that the district court erred by using "the primary caretaker doctrine" in light of "the new best interest factors" in Minn. Stat. § 518.17, subd. 1(a) (Supp. 2015). Mother counters that the district court "properly considered the parties' caretaking of the child as one of the enumerated best interest factors that the [district] court 'must consider and evaluate' under Minn. Stat. § 518.17, subd. 1(a)(6)."

"In evaluating the best interests of the child for purposes of determining issues of custody and parenting time, the court must consider and evaluate all relevant factors, including" 12 statutory best-interest factors. Minn. Stat. § 518.17, subd. 1(a). Prior to the legislature's 2015 amendment of Minn. Stat. § 518.17, subd. 1(a), "the child's primary caretaker" was one of the statutory factors. Minn. Stat. § 518.17, subd. 1(a) (2014); 2015 Minn. Laws ch. 30, art. 1, § 1, at 269-72. Although "the child's primary caretaker" is no longer listed as a statutory factor, one of the new factors is "the history and nature of each parent's participation in providing care for the child." Minn. Stat § 518.17, subd. 1(a)(6).

The district court considered each of the 12 best-interest factors under the 2015 version of Minn. Stat. § 518.17, subd. 1(a). In discussing three of the factors, the district court mentioned mother's history as N.O.K.'s primary caretaker.[1] Because the best-interest

---

[1] The district court also mentioned mother's history as N.O.K.'s primary caretaker in considering "[t]he benefit to the child in maximizing parenting time with both parents and

7

factors include "the history and nature of each parent's participation in providing care for the child" and a parent's history of caregiving is relevant to that parent's ability to care for the child in the future, the district court did not abuse its discretion by considering mother's history as primary caretaker for N.O.K. *See id.*

## II.

Father contends that the district court erred by "making combined findings for legal and physical custody of [N.O.K.] in its Memorandum." The district court "must make detailed findings on each of the [best-interest] factors . . . based on the evidence presented and explain how each factor led to its conclusions and to the determination of custody and parenting time." Minn. Stat. § 518.17, subd. 1(b)(1) (Supp. 2015). But father does not cite authority supporting the proposition that a district court must make separate legal and physical custody findings regarding the best-interest factors. Although it may have been preferable for the district court to have more precisely described how the best-interest factors separately applied to legal and physical custody, the district court did not abuse its discretion by making combined findings.

## III.

Father argues that the district court erred by considering the fact that mother had sole legal and sole physical custody of N.O.K. in the past. In particular, father contends that the district court erred by concluding that the "willingness and ability of parents to

---

the detriment to the child in limiting parenting time with either parent," noting that adopting father's "proposed 50/50 parenting time schedule would be a substantial change in the child's life."

cooperate in the rearing of their child" factor strongly favored granting mother sole legal and sole physical custody of N.O.K. Father argues that the parties' "mutual nastiness to each other" and mother's sole legal custody by default is not a basis for awarding her sole legal and sole physical custody.

Given the parties' lack of cooperation in the past, the mutual animosity between them, and the lack of evidence in the record that the parties were likely to cooperate in the future, it was not an abuse of discretion for the district court to determine that the "willingness and ability of parents to cooperate" factor did not favor joint legal and physical custody. Moreover, the only alternative to joint custody presented to the district court was mother retaining sole legal and sole physical custody of N.O.K. In sum, the district court did not abuse its discretion by concluding that the "willingness and ability to cooperate" factor favored mother retaining sole legal and sole physical custody of the child.

**IV.**

Father argues that the district court erred in applying the domestic-abuse best-interest factor. Father notes that even though the district court found that no domestic abuse had taken place, it found that father had been "'aggressive' towards [mother] and then found [father's] 'aggression'" to be a basis for finding that the domestic-abuse best-interest factor weighed in favor of awarding mother sole legal and sole physical custody of N.O.K.

The district court must consider "whether domestic abuse, as defined in section 518B.01, has occurred in the parents' or either parent's household or relationship; the nature and context of the domestic abuse; and the implications of the domestic abuse for parenting and for the child's safety, well-being, and developmental needs." Minn. Stat.

9

§ 518.17, subd. 1(a)(4). Minn. Stat. § 518B.01, subd. 2(a) (2014) defines "domestic abuse" as "(1) physical harm, bodily injury, or assault; (2) the infliction of fear of imminent physical harm, bodily injury, or assault; or (3) terroristic threats . . . criminal sexual conduct . . . or interference with an emergency call" if "committed against a family or household member by a family or household member."

The district court noted incidents in which father had been verbally aggressive towards mother and her family, including the car-seat and photo-studio incidents, and stated that the latter two incidents were "concerning to the Court." Although the district court concluded that none of the incidents "constitute[d] domestic abuse as defined by Minn. Stat. § 518B.01," it nonetheless concluded that the domestic-abuse factor weighed in favor of an award of sole legal and sole physical custody to mother.

When applying the domestic-abuse factor, the district court must consider whether domestic abuse has occurred, as defined in Minn. Stat. § 518B.01 (2014 & Supp. 2015), and if so, the implications of that abuse for the child. Minn. Stat. § 518.17, subd. 1(a)(4). Because the district court did not determine that domestic abuse had occurred, the domestic-abuse factor is not applicable here. To the extent that the district court concluded that the domestic-abuse factor favored mother's retention of sole legal and sole physical custody of N.O.K. based on conduct that did not constitute domestic abuse as defined by Minn. Stat. § 518B.01, the court erred.

However, this error is harmless because the district court could consider the incidents of "aggressive behavior" under Minn. Stat. § 518.17, subd. 1(a), which requires the district court to "consider and evaluate all relevant factors." Father's aggressive

10

behavior towards mother in the child's presence is relevant to the district court's child-custody determination because it indicates that the parties cannot, at this time, cooperatively raise their child. And the district court is better situated than this court to determine the relevant factors bearing on a child's best interests. Because father's aggressive behavior is relevant to the district court's custody determination, the district court did not abuse its discretion by considering that behavior.

Father assigns error to the district court's consideration of several other best-interest factors. The district court considered each of the 11 other factors and made specific findings on each factor. A careful review of each of father's arguments and the record indicates that the district court properly considered the best-interest factors. Each allegedly erroneous best-interests finding is either directly supported by the record or involves a credibility determination to which this court must defer. In sum, the district court did not abuse its discretion in applying the best-interest factors.

## V.

Father contends that "[t]he [district] court did not address the statutory rebuttable presumption [of joint legal custody] under" Minn. Stat. § 518.17, subd. 1(b)(9) (Supp. 2015). "The court shall use a rebuttable presumption that upon request of either or both parties, joint legal custody is in the best interests of the child." Minn. Stat. § 518.17, subd. 1(b)(9). The district court found that the statutory presumption of joint legal custody had been rebutted because "[t]he parties have a high level of animosity towards each other, they do not agree on many basic parenting decisions, and they have no methods for resolving conflict."

Father relies on *Berthiaume v. Berthiaume*, 368 N.W.2d 328 (Minn. App. 1985), arguing that "[t]he acrimony between the parties must be shown to affect the child, here there was no showing the child was affected" and that the parties "do not appear to differ substantially in their wishes for the care of the child." In *Berthiaume*, the district court acknowledged that the parents did not cooperate during a dissolution proceeding, but also found that their mutual concern for the children would enable them to cooperate in the future. 368 N.W.2d at 332.

In this case, the district court found that "the parties do not cooperate in the rearing of their child," noting that "the parties are not able to agree on the child's name; [mother] hid the child's baptism from [father] because she feared he would cause a scene at the ceremony; [and father's] family is of the opinion that the child has a hearing problem and developmental delays or disabilities," concerns that mother does not share. These findings, which are supported by the record, suggest that the parties cannot cooperatively make decisions regarding N.O.K.

The district court also found that "[t]he parties do not take adequate measures to minimize exposure of the child . . . to parental conflicts" and that "[t]he parties do not utilize any methods for resolving disputes." These findings are supported by the record. For example, the record contains extensive testimony regarding verbal abuse during parenting-time exchanges. The parties testified that they have called the police multiple times prior to and during parenting-time exchanges because of conflict related to those exchanges. The record lacks evidence that the parties will cooperatively parent in the future.

12

In sum, the circumstances here are unlike those in *Berthiaume* where the district court found that the parents' mutual concern for the child would enable them to cooperatively parent. The district court did not abuse its discretion by determining that the joint legal custody presumption had been rebutted.

## VI.

Father contends that the district court erred by failing to "address the statutory presumption in favor of awarding a parent at least 25% overnight parenting time." According to father's brief, the district court awarded him "87.25 possible overnights" rather than the 91.25 possible overnights it should have awarded him under the 25% statutory presumption.

"[A] district court has broad discretion to decide parenting-time questions" and appellate courts "will not reverse a parenting-time decision unless the district court abused its discretion by misapplying the law or by relying on findings of fact that are not supported by the record." *Suleski v. Rupe*, 855 N.W.2d 330, 334 (Minn. App. 2014); *cf. Olson v. Olson*, 534 N.W.2d 547, 550 (Minn. 1995) ("The [district] court has broad discretion to determine what is in the best interests of the child in the area of visitation and its determination will not be overturned absent an abuse of discretion.").

> In the absence of other evidence, there is a rebuttable presumption that a parent is entitled to receive a minimum of 25 percent of the parenting time for the child. For purposes of this paragraph, the percentage of parenting time may be determined by calculating the number of overnights that a child spends with a parent or by using a method other than overnights if the parent has significant time periods on separate days when the child is in the parent's physical custody but does not stay overnight. The court may consider the age of the child

13

in determining whether a child is with a parent for a significant period of time.

Minn. Stat. § 518.175, subd. 1(g) (Supp. 2015).

District courts must "demonstrate an awareness and application of the 25% presumption when the issue is appropriately raised and the court awards less than 25% parenting time." *Hagen v. Schirmers*, 783 N.W.2d 212, 217 (Minn. App. 2010). This court will not consider an argument based on the 25% presumption when that argument has not been raised in the district court. *See id.* at 219 & n.4 (noting that it is "important" that the 25% parenting-time presumption was brought to the attention of the district court in that case because "we do not consider matters not argued to and considered by the district court" (citing *Thiele*, 425 N.W.2d at 582)).

Father did not cite the statutory 25% parenting-time presumption in his filings in district court or during the evidentiary hearing. Nor did he file a posttrial motion for a new trial or amended findings and judgment alleging that the district court failed to apply the statutory 25% parenting-time presumption. Father contends that although he "did not specifically state he sought at least (25%) twenty-five percent overnight parenting time," there "is no question the issue of parenting time was before the Court," and that not applying the presumption because he did not make an express reference to the 25% parenting-time presumption in the district court is an absurd result.

The phrase "appropriately raised" in *Hagen* would be meaningless if making any argument about parenting time was adequate to raise the 25% statutory presumption. *See* 783 N.W.2d at 217 (stating that district courts must demonstrate an awareness and

14

application of the 25% presumption "when the issue is appropriately raised and the court awards less than 25% parenting time"). Because father did not request application of the 25% presumption in the district court, the issue is not properly before this court. We decline to reverse the parenting-time order on the grounds that it did not award father at least 25% parenting time where father did not expressly request application of the statutory parenting-time presumption in the district court and the resulting deficiency amounts to four nights a year.

## VII.

Father argues that the district court "should have continued the evidentiary hearing so [he] could have obtained counsel, reviewed [mother's] Counter Petition and [mother's exhibits], which he did not see until the day of the hearing." He contends that "[t]he totality of the circumstances show [that he] was prejudiced at the hearing with the result being an unfair advantage given to [mother]."

At the beginning of the evidentiary hearing, the district court stated that it did not believe mother had "given [father] sufficient notice in order to go forward" on mother's counterpetition because mother did not timely file the counterpetition. The district court therefore offered father a brief continuance. Father asked if he could discuss his options with his family, and the district court allowed him to do so. After a 41-minute recess, father informed the district court that he wanted to proceed with the evidentiary hearing that day.

Father argues that "a written waiver should state [that] the pro-se person is waiving a right to an attorney, knowingly and voluntarily" and contends that his "waiver was not knowing and voluntary." He relies on *Schroetke v. Schroetke*, 365 N.W.2d 380 (Minn.

App. 1985), for this proposition. But *Schroetke* is distinguishable because it involved a child-support stipulation that required a specific waiver of counsel under "Rule 3.09 of the Minnesota Family Court Rules." 365 N.W.2d at 382. Moreover, although father initially asked to continue the hearing and expressed uncertainty about whether to proceed, after a recess, he told the court he wanted the court to decide the child-custody issue "today." In sum, the district court did not err by holding the evidentiary hearing on the scheduled date.

Father further argues that mother's "action of mailing the Counter-Petition (5) days prior to the hearing to an address she knew was incorrect," or should have known was incorrect, and "her failure to even provide [father] a copy of the exhibits at the hearing call for the matter to be remanded in the interests of justice." (Citation omitted.) This court has held that the interests of justice can justify reversing a district court's child-custody determination when one of the parties is "seriously prejudiced" by the misconduct of the district court or the other party related to the proceeding. *Moir v. Moir*, 400 N.W.2d 394, 398 (Minn. App. 1987).

It is unclear how father was seriously prejudiced by lack of notice regarding the counterpetition. In the counterpetition, mother sought sole legal and sole physical custody of the child, parenting time as agreed to by the parties, parenting-time exchanges at the Savage Police Department, and a name change for N.O.K. In a motion in response to father's motion for temporary relief, ten months before the final custody hearing, mother sought "temporary and permanent sole legal and sole physical custody of [N.O.K.]," parenting-time exchanges at the Savage Police Department, and a name change for N.O.K., among other relief. Thus, mother's request regarding custody, the parenting-time exchange

16

location, and a name change for N.O.K. were brought to father's attention well in advance of the evidentiary hearing. And father does not explain how he was seriously prejudiced by not receiving a copy of mother's trial exhibits. Under the circumstances, father has not shown that the interests of justice require reversal.

**VIII.**

Mother moves this court to strike the documents "attached to [father's] Brief Addendum A-1 and A-10 from the record on appeal and any references made thereto in [father]'s Brief, and not consider them on the grounds that said documents are not part of the record on appeal as stated in Minn. R. Civ. App. P. Rule 110.01." Father contends that "[i]n the interest of justice, the court should consider the child's IFSP (Individual Family Service Plan) . . . that resulted from the IFSP meeting held on November 12, 2015," which was after the custody hearing. Father argues that because N.O.K. has "special needs, the Court, has the opportunity to assist [N.O.K.] in obtaining the appropriate services and supervision by including consideration of his special needs, even if confirmed after the trial date."

The record on appeal consists of "[t]he documents filed in the trial court, the exhibits, and the transcript of the proceedings, if any." Minn. R. Civ. App. P. 110.01. This court generally "will strike documents included in a party's brief that are not part of the appellate record." *Fabio v. Bellomo*, 489 N.W.2d 241, 246 (Minn. App. 1992), *aff'd*, 504 N.W.2d 758 (Minn. 1993).

The challenged documents are an "Individual Family Service Plan" dated November 24, 2015 and a document labeled "Burnsville Surgery Center" dated

17

October 26, 2015. These documents were not part of the evidentiary record before the district court when it made its custody and parenting-time determinations. We therefore strike both documents from father's addendum, as well as any references to the documents in father's brief.

**Affirmed; motion granted.**